Commonwealth ex rel. A. G. Morris et al. *v.* A. A. Stevens, President, G. L. Owens, Secretary, D. S. Kloss, Treasurer, William Walton, Charles A. Morris, A. G. Morris, A. A. Stevens, G. L. Owens and D. S. Kloss, Managers of the Tyrone Water and Gas Company.

*Corporations—Quo warranto—Corporate elections—Directors.*

A stockholder in a corporation who has been elected a director has a standing in quo warranto proceedings to contest the right of other persons to hold the office of director although they were elected at the same meeting at which he himself was elected and his title was not disputed. As a stockholder he has the right to have the votes properly counted, and the affairs of the company committed to the charge of the officers legally elected by a majority of the stockholders.

*Corporations—Elections—Contest involving several offices—Act of June 14, 1836, sec. 8—Quo Warranto.*

Under the act of June 14, 1836, sec. 8, P. L. 621, giving the court discretionary power to try "the several rights of different persons" by one writ of quo warranto, the title to different offices may be determined in one writ.

Where the offices in controversy are different, but the title of the incumbents as to all of them depends upon the same votes at the same elec-

tion, and a decision on the validity of that election will be equally conclusive as to the rights of all, the controversy as to all of the offices may be determined by one writ of quo warranto.

Where a person holds certificates of stock on which he is prima facie entitled to vote, a preliminary injunction issued before the election, the intention and effect of which were to merely restrain him from negotiating or transferring the stock, will not deprive him of the right to vote the stock at the election.

Argued Feb. 22, 1895. Appeal, No. 32, Jan. T., 1895, by defendants, from judgment of C. P. Blair Co., Oct. T., 1892, No. 85, on verdict for plaintiffs. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Quo warranto to determine the right of defendants to act as officers of the Tyrone Water and Gas Co. Before BELL, P. J.

At the trial it appeared that the Tyrone Gas and Water Company was incorporated by an act of the legislature approved March 10, 1865, under the provisions of which the members of the company were to elect from their number a president, treasurer and secretary and a board of six managers. At the annual meeting of the members of the company held on the first Monday of July, 1890, C. Guyer was elected president, and A. B. Hoover, treasurer, A. A. Stevens secretary, and C. Guyer, A. B. Hoover, A. A. Stevens, A. G. Morris, G. W. Burket and W. A. Guyer as managers. No election was held in 1891, and the officers elected in 1890 held over.

Under the provisions of the act of incorporation, certificates of stock in the company are transferable by the holder at his pleasure, in the presence of the president, treasurer, or other persons appointed by the company for that purpose. And when such assignment shall have been made and entered upon the books of the company, then the transferee shall be a member of said company, and at every election or meeting of the stockholders of the company shall be entitled to one vote for each share of stock by him held.

On June 30, 1892, A. G. Morris was the holder of certificates representing 808 shares. Included in these shares were 253 shares claimed by the creditors of A. B. Hoover. On July 2, 1892, the creditors of Hoover obtained a preliminary

injunction against Morris restraining him " from exercising any ownership or control of the said 230 or more shares of the capital stock of the Tyrone Gas and Water Company and from selling, assigning, transferring, secreting or disposing of the same, and that the Tyrone Gas and Water Company and its officers are enjoined from transferring the said shares of stock on its books and from in any way approving or recognizing the transfer of the same by said Hoover or Wood to Morris or any other person, and by said A. G. Morris to any person whomsoever until our court make further order to the contrary."

July 27, 1892, on motion to dissolve this interlocutory injunction, DEAN, P. J., filed the following opinion:

" On the 2d day of July last, late in the evening (Saturday), a bill in equity was presented to me by counsel for creditors of the insolvent Tyrone Bank setting out 253 shares of stock of said Tyrone Gas and Water Co. had been fraudulently transferred to A. G. Morris with intent to place the same beyond the reach of creditors of said bank, and praying for a preliminary injunction directed to said Morris and said Water Company enjoining them from in any manner negotiating, transferring or using said stock until the right or title to said stock should be legally determined. The injunction was awarded, was served on both A. G. Morris and the Water Company.

" The annual election of directors of the Water Company is on the first Monday in July in each year, and in this year fell on Monday, the 4th day of July, the day but one after the injunction was granted—and this intervening day being Sunday, at the election on Monday the disputed 253 shares of stock in the hands of Mr. Morris were not voted for directors; the tellers rejected them because of the preliminary injunction. If Mr. Morris had been allowed to vote them, they with other stock held by him would have constituted a majority of the whole stock and given him a controlling interest; excluding them left him a minority stockholder.

" No such effect as this was intended by the preliminary injunction; not a hint is given in the bill that the annual election was to be held in forty-eight hours after the injunction was awarded or that it was intended to control the election. The injunction was solely to restrain the negotiation or trans-

fer of the stock until the title to it was determined.  If the fact of the early election had been disclosed to me, either in the bill or orally by the counsel presenting it, I would have directed either that the injunction should not affect Mr. Morris' right to vote the stock, or that the annual election should be postponed until the title to the stock had been determined. The injunction was wrested from its purpose and was made to accomplish a wholly different one ; the purpose was to keep the stock in Mr. Morris' hands for the benefit of the creditors of the Tyrone Bank, should they establish a right to it; the injunction was used in the interest of rival stockholders to oust Mr. Morris from the control of a corporation in which he had a large interest outside the disputed 253 shares, and this without a hearing or notice to him.

" Such a despotic use of power by a judge, if the facts had been brought to his notice, would have been in the highest degree reprehensible; as the facts were not made known at the time, I can now only do whatever is within my power to preserve the rights of the complaining stockholder.

" The injunction heretofore granted at the instance of A. G. Morris restraining the Tyrone Gas and Water Company from incurring any debt for new and extraordinary improvements, from issuing or inviting or accepting subscriptions to any new stock or additional stock to that already issued, is continued until the evidence as to the ownership of said 253 shares of stock be taken by the master appointed for that purpose.  As to the water pipe ordered before the injunction was served, the said Gas and Water Company is allowed to receive and pay for the same out of any money now in the treasury of the company, or which may come in from the ordinary receipts, but it is not authorized to issue either directly or indirectly new stock in payment for the same.

" It is urged that there is a necessity for extraordinary improvements of the property of the company immediately; this may be the case but it gives us no right to authorize what may prove a minority of the stockholders of a company to manage a property in defiance of the will of what may prove a majority.

" As to the allegation that the president and board of directors of the company have treated the order of the court, heretofore made, with contempt, the president, A. A. Stevens,

Esq., by his oath on file has expressly denied and disclaimed any such action. No decree in that matter is therefore necessary." .

On July 4, 1892, the annual meeting of the company was held, and Morris voted the 808 shares standing in his name. The tellers allowed the ballots to be deposited, but rejected in the count the 253 shares in controversy.

The writ of quo warranto was issued on Aug. 1, 1892. Defendants moved to quash the writ for the following reasons:

" First. There being no dispute about the election of A. G. Morris, the relator, to the office of director of Tyrone Gas and Water Company, he cannot test the title of any other of the officers of said corporation in these proceedings. That can only be done by those claiming such offices as against the de facto officers in possession of the office.

" Second. The right to exercise separate and distinct offices in a corporation cannot be raised, as here attempted, in one and the same proceeding, as the suggestion in this case shows that it raises the question of title to the following several and distinct officers: A. A. Stevens, President; D. S. Kloss, Treasurer; G. Lloyd Owens, Secretary; A. G. Morris, Director; Charles A. Morris, Director; D. S. Kloss, Director; G. Lloyd Owens, Director; A. A. Stevens, Director; William Walters, Director; which defendants submit cannot be done, and the writ should be quashed."

The court overruled the motion to quash, KREBS, P. J., of the 46th judicial district, filing the following opinion:

" The first reason assigned cannot in our opinion be maintained. The suggestion filed discloses a clear ground of interest in the relator who filed the same. His interest consisted in his right to vote the 253 or more shares of stock; the right to vote which, if his suggestion be true and on this demurrer must be taken as true, he was deprived of and thereby a board of directors elected by a minority contrary to his right. If the election of Mr. Morris to the board of directors as part of the ticket of Mr. Stevens and those acting with him could have the effect of preventing an inquiry into the method and legality of the corporate election, then any minority of a private corporation who might be reckless enough of the rights of a stockholder or stockholders to disregard what otherwise might be

required, could stifle inquiry and prevent investigation by placing upon their ticket such of the opposition as they might think would institute proceedings for such an investigation. We cannot assent to the rightfulness of such a contention.

" But leave has been asked and is hereby granted to the relator to join with him and amend the record by adding as corelators, Caleb Guyer, C. A. Morris, T. K. Morris ; and of these there are those to whom the first reason could not apply if it is well taken as to A. G. Morris.

" We come now to the second reason assigned, namely, that the right to separate and distinct offices cannot be raised in one suggestion.

" The 8th section act of June 14, 1836, is in these words : ' If it shall appear to the court or judge as aforesaid that the several rights of different persons may be properly determined by one writ, it shall be lawful for such court or such judge to make such order or orders for the introduction or addition of such persons into the writ or for notice to such persons to appear and take defense, as shall be reasonable and just.' This statute is remedial, and is to be so construed and administered as to advance, that is, render effective, the remedy. This is the rule of all remedial statutes : Com'th v. Dillon, 61 Pa. 488. The language of the statute is broad and comprehensive and the court cannot by restrictive construction fritter away its plain meaning. Wherever the several rights of different persons may be properly determined by one writ it shall be done.

" The learned counsel has cited the opinion of Judge LIVINGSTON, from 3 Lanc. Bar, 177, in which it is ruled that several persons claiming different offices cannot unite in one and the same information for the purpose of determining the title to both offices in one proceeding. The learned judge in that case after citing the 8th section of the act of 1836, supra, says, ' that it applies more particularly to writs of quo warranto issued at the suggestion of the attorney general against corporators in which all may be joined and it may be also applied in all cases where two or more persons hold one and the same office.' . . .

" But upon what grounds does he thus narrow the provisions of the statute ? There is no express language in the statute that requires it. The first, second and third sections of the act declare the jurisdiction, causes, and at whose instance the writ

may issue.   The 4th section prescribes the form of the writ and the remaining sections of the statute regulate the process, service, pleadings and judgment, with execution thereon.   Not one word limiting the powers conferred in the 8th section to the writ when sued out by the attorney general.

"But the learned judge says: 'It may be also applied in all cases where two or more persons hold one and the same office: as where two or more are trustees,' etc., etc.   There need not be any conflict of opinion upon the construction of this act of 1836.   The office contested or questioned by the suggestion is the office of the directorship of the Tyrone Gas and Water Company.   The office of president, secretary and treasurer is but the result of being a director or manager of the corporation, and unless a director, the person cannot be a president, secretary or treasurer.   So that there is nothing in the opinion of Judge LIVINGSTON in Com'th v. Martin, 3 Lanc. Bar, 177, which militates against the joinder of the defendants or the corelators in one and the same information.   The office questioned is the directorship.   It is not pretended that if the board which elected Mr. Stevens president was a duly elected board of directors or trustees that his election as president of the board is not legal.   His office as president stands or falls as an incident of the proceedings touching the election of the board of directors and not otherwise.

"But apart from this view is another, and to our minds is another equally forceful.   It is that the policy of the law is to cheapen litigation while preserving the rights of the parties.   Nothing can be done that will deprive either party of a full hearing by the joinder.   The suggestion discloses but a single cause of complaint.   That cause applies equally to all or it applies to none.   In one form, a writ of quo warranto is a proceeding to contest an election, and while the lower courts have for years differed upon the question of the joinder of more than one office in a contested election of ballots under our election laws, the opinion of the Supreme Court, in Mook et al. v. Conrad et al., from quarter sessions of Phila. Co., has set at rest that question in favor of the joinder in a single petition or one proceeding.   We think the rule may well apply to a proceeding by quo warranto by analogous reasoning.

"It is therefore ordered this 15th June, 1893, that the demur-

rer be overruled and defendants required to file their answer within ten days. And it is further ordered that pending the trial of these proceedings the injunction heretofore awarded by Judge DEAN on July 27, 1892, be and continue in full force and effect; and that no stock be issued, nor debt created for any purpose except by application to and leave granted by the court, and it is further ordered that the annual election to be held on the 1st Monday of July, 1893, be continued over until the 3d Monday of October, A. D. 1893. The trial at this term continued, but the cause to be set for trial on the 9th day of October, A. D. 1893, at the head of the list for that week."

At the trial the jury returned a verdict for plaintiffs subject to certain points of law reserved. The court subsequently entered judgment in favor of plaintiffs on the verdict, BELL, P. J., filing the following opinion:

"The points reserved in this case raise two main questions:

"First. Were the tellers at the election for officers for the Tyrone Gas and Water Company, held July 4, 1892, justified in refusing to count 200 of the shares voted by A. G. Morris?

"Second. Assuming that said tellers were justified in such refusal, which ticket did, in point of fact, receive the majority of legally qualified votes cast?

"At the date of said election there were eighteen hundred and sixty-nine (1869) shares of stock outstanding. Ballots representing nine hundred and fifty-five (955) shares were deposited in the hat (used as a ballot box) for the Morris ticket, that is the relators, or plaintiffs, in this action. These ballots clearly represented a majority of the stock and most certainly elected the Morris ticket unless the tellers were justified in their action in refusing to count two hundred (200) of the shares as voted. At the trial we instructed the jury as follows:

"'We instruct you that there being no challenge of the right to vote those 808 shares,' (part of the Morris stock) 'that when the 808 shares were once in the teller's hat, they had no right then arbitrarily to strike off 200 shares of that stock,—to disfranchise 200 shares as they did.'

"This instruction was pro forma, but we are by no means convinced that it was wrong. In fairness to a voter, challenges of his right to vote should be made at a time when he can answer the challenge; his vote should not be rejected, espe-

cially after it has once been placed in the ballot box, without giving him an opportunity to be heard, and, if possible, establish his right to have the vote counted.  And the undisputed evidence in this case is that the 200 shares, which the tellers refused to count, were rejected without giving Mr. Morris an opportunity to be heard.

" Dr. G. W. Burket, one of the tellers, called by plaintiffs, testified as follows:

" Q.  Didn't the tellers retire to compute the vote?  A. Yes, sir.

" Q.  Was Morris present?  A. No.

" Q.  Didn't Morris call you out from the room?  A. No, I came out; then they objected to that part of it; I called on Morris—this thing came up and Mr. Owens replied that if Morris came why Stevens must come in.

" Q.  Didn't you go out to report to Morris the result? A. " No, sir.

" Q.  You called him out and asked him what you should do about the 253 votes?  A. I went out to consult him about this, yes, about this amount that was being thrown out, but I didn't get any consultation because they claimed, if Morris came in there to be consulted, Stevens would come in, and that part was dropped and we settled the matter just as reported there with my protest."

G. L. Owens, Esq., another teller called by defendants, substantially corroborates this testimony of Dr. Burket.  Mr. Owens says:

" Q.  Before the tellers had made their report, did Dr. Burket wish to consult with Morris?  A. Yes, sir; just before signing he wanted to see Mr. Morris, and he went out and called him in, and Morris came in; I made the remark that if Morris came in one of the leading men, Stevens, should come in, and Burket acquiesced in that; I think he and Morris had some little talk about it.

" What was this but a disfranchisement of the two hundred shares without allowing Mr. Morris, who had voted them, a hearing?  For this reason, if no other, we think the tellers erred in refusing to count said two hundred shares.

" [But, again, the said rejection of the said two hundred shares was erroneous, in our opinion, because the tellers arbi-

trarily refused to count that number of shares for the Morris ticket, without having any means of identifying, by name, number or otherwise, the particular stock affected by the injunction, and without attempting to identify same, and without adopting any course of procedure which might have resulted in such identification ] [19]

" It is true that this last reasoning savors of technicality, but, if this be urged as an objection against its conclusiveness, we might respond that the whole case of the defendants bristles with technicalities. If we were called on to settle this present controversy by the golden rule, we would adjust it about as follows:

" Mr. Morris and his adherents are the owners—the equitable owners at least—of some nine hundred and forty-nine (949) shares of stock; Mr. Stevens and his friends control but eight hundred and eighty-six (886) shares; Mr. Morris therefore has a clear majority of the stock. The injunction issued by the court was issued at the instance of creditors of A. B. Hoover and was intended, not to disfranchise the Hoover stock, but to preserve it within the grasp of the law so that, if it should be ascertained that it was transferred by Hoover in fraud of the rights of his creditors, it might be restored to said creditors. The injunction resulted in the tellers disfranchising the Hoover stock in the hands of Mr. Morris at the election. Such a result was not the primary object, or ostensible purpose, of the injunction,—could not advance the interests of Hoover's creditors,—and was a manifest injury and injustice to Mr. Morris, because it deprived him of his rights as the majority stockholder in the water company. Such wrong should be righted and Mr. Morris should be allowed to control the affairs of the company.

" At the trial of this case we were of the opinion, and so instructed the jury, that the act of Mr. Morris in voting the Hoover stock was a violation of the injunction, and that the tellers would likewise have violated the injunction, in allowing the Hoover stock to be voted, had the right to vote said stock been challenged at a proper time and in a proper manner.

" Subsequent reflection and examination of authority have caused us to waver in this opinion, if not wholly to change our mind.

" The primary purpose, the ostensible object, of the bill of
equity, on which the injunction was based, was to preserve the
Hoover stock within the grasp of the Hoover creditors. The
recitals in the injunction follow the bill, and said injunction is
in effect a mandate commanding that no act be done which
would prejudice the alleged right of the Hoover creditors. The
object of the injunction was to protect creditors, not to dis-
franchise the stock. How could the act of Mr. Morris in vot-
ing the stock prejudice the Hoover creditors ? Such act of
voting would not make him a bona fide holder for value with-
out notice. And we cannot see how the reception and count-
ing of his vote by the tellers could throw even a straw in the
pathway of the Hoover creditors to impede them in their con-
test for the stock.

" Voting the stock doubtless was a violation of the letter of
the injunction, but how, and why, was it a violation of the spirit
of the injunction ? And courts punish those who violate the
spirit, not the letter, of an injunction.

" In High on Inj. sec. 1419, it is said : ' Where proceedings
in attachment are instituted to punish a defendant for breach
of an injunction, the fact of his guilt must be clearly and ex-
plicitly established to the satisfaction of the court. But, while
the injunction must be implicitly obeyed, it is the spirit and
not the strict letter of the mandate to which obedience is ex-
acted, and complainant, failing to prove a violation of this to
the satisfaction of the court, the rule for an attachment for
contempt will be discharged.'

" Again in same work, section 1446, it is said ' In deciding
whether there has been an actual breach of an injunction it is
important to observe the objects for which the relief was granted,
as well as the circumstances attending it. And it is to be
observed that the violation of the spirit of an injunction, even
though its strict letter may not have been disregarded, is a
breach of the mandate of the court. . . . Upon the other hand,
when the conduct complained of, although literally a breach
of the injunction, is not so in spirit, and when defendants have
acted in good faith, and there is no evidence of any intention
on their part to violate the writ, they will not be held guilty
of a contempt of court.'

" We conclude, therefore, that the chancellor, issuing the

injunction, would not have punished Mr. Morris for voting the Hoover stock, since the violation alleged was of the letter only and not of the spirit. If this be true, why should we, in a collateral proceeding, inflict a penalty on Mr. Morris by disfranchising him, and why should we justify the tellers in refusing to count this stock? Such justification of such refusal is founded on the idea that the court issuing the injunction would have punished the tellers had they counted the vote, but if said idea rests on an unstable foundation, and we think it does, the idea itself becomes delusive and misleading.

"After the somewhat careful consideration of the matter we have come to the conclusion that we must give a negative answer to the first question raised, namely: 'Were the tellers justified in refusing to count two hundred of the shares voted by A. G. Morris?'

"Such denial of said first question in effect, we think, leaves the defendants with nothing to support their claim, because it must be remembered that Mr. Morris' vote was not rejected because his stock was improperly transferred—or rather not transferred on the books of the company—but because of the pendency of the injunction.

"But our answer to said first question may be erroneous, we will therefore briefly consider the second question, namely:

"Assuming that said tellers were justified in such refusal to count the two hundred shares, which ticket did, in point of fact, receive the majority of legally qualified votes cast?

"The right of Mr. Stevens to vote two hundred and fifty-five (255) shares is undisputed; Mr. Morris likewise held one hundred and forty-one (141) shares, which indisputably were entitled to be voted; certificates for these said shares had been regularly issued to these gentlemen some time (possibly several years) prior to the present controversy.

"Mr. Stevens, however, voted six hundred and twenty-five (625) additional shares. Had he a legal right to vote said additional shares? We think not.

"The act of assembly incorporating this Gas and Water Company (act of March 10, 1865, P. L. 1866, p. 1149) makes the following provision:

"'Section 7. That the president and managers shall procure certificates of stock, which, signed by the president and treas-

urer, and sealed with the corporate seal, shall be delivered to each stockholder, and which shall be transferable at his pleasure, in the presence of the president, treasurer, or other person appointed by the company, for that purpose, subject, however, to all assessments due and to become due thereon : and when such assignment shall have been made, and entered upon the books of the company, the holder shall be a member of said company, and in every election, or meeting of the stockholders of the said company, shall be entitled to one vote for each share of stock by him, or them, held.'

" The said six hundred and twenty-five (625) additional shares voted by Mr. Stevens were principally—if not wholly—purchased by him from Caleb Guyer. Mr. Guyer and Mr. A. B. Hoover (original owner of the Hoover stock now owned by Mr. A. G. Morris) had been partners in the Tyrone Bank which became insolvent in December, 1891. About the time of the failure of the bank Mr. Guyer sold his stock in the water company to Mr. Stevens. A transfer of same was signed on the back of the certificates, but Mr. Stevens failed to surrender said stock, have the assignment entered on the books of the company, or have new certificates issued to him. It is true that a lead pencil memorandum was made, opposite the record showing the original issue of stock to Mr. Guyer, ' to A. A. Stevens,' but we do not deem said pencil memorandum to be such ' entry on the books of the company ' as would, from a legal standpoint, entitle Mr. Stevens to vote said stock. [The section of the incorporation act just quoted says that there must be ' an entry in the books of the company,' and after such entry the transferee shall have a right to cast one vote for each share by him held. We think the entry contemplated was a surrender of the old shares, and the issuing of new ; that such was the interpretation adopted by the company, and their custom is shown by the testimony of Mr. Guyer on page 25 of the notes of testimony.

" The six additional shares voted by friends of Mr. Stevens were also illegally voted, as the persons voting were only equitable holders of the stock and there was no pretense that any transfer to them had been entered on the books of the company.

" [We conclude therefore that Mr. Stevens for president, and his ticket for the other offices, only received two hundred

and fifty-five (255) legally qualified votes, to wit, the votes cast on the original holding of Mr. Stevens.] [24]

" As we have said, the right of Mr. Morris to vote one hundred and forty-one (141) shares (his original holding) is unquestioned.   He voted in addition eight hundred and eight (808) shares (including the 253 shares originally owned by Hoover) and his son C. A. Hoover voted three (3) shares. Dr. Burket also voted three shares for the Morris ticket, but Dr. Burket's shares were not in proper form to be voted, as no transfer to him was entered on books of the company.

" The eight hundred and eight shares so voted by A. G. Morris, and also the three shares voted by Chas. A. Morris, appeared to be regularly entered and transferred on the books of the company, but the defendants challenge and contest the regularity of such entry and transfer because made by persons who defendants allege were not officers of the company.

" Up to December, 1891—the date of the failure of the Tyrone Bank—it is admitted that Caleb Guyer was president, and A. B. Hoover treasurer of the water company.  About the time of said failure Mr. Guyer sold all his stock to Mr. Stevens and Mr. Hoover also sold all his stock,—said Hoover stock ultimately being transferred to A. G. Morris.

" Defendants most strenuously contend that when Guyer and Hoover ceased to be stockholders, they also ceased ipso facto to be officers of the company, and that the entry by them on June 30, 1892, of a transfer of eight hundred and eight shares of stock to Mr. Morris, and the issuance by them, as president and treasurer of the company, of new certificates for said stock was illegal and vested in Mr. Morris no right to vote said stock.

" We are of the opinion that under the act of incorporation of this water company it was obligatory that the officers should be stockholders.  We conclude this to be so from the fact that only such original corporators, as should become stockholders, should be directors or managers,—managers is the term used in the act of incorporation.  If this is so, Mr. Guyer ceased to be president de jure and Mr. Hoover ceased to be treasurer de jure when they parted with their stock, but we think that although they ceased to be officers de jure they still continued to be officers de facto.

" In Cook on Stock and Stockholders, ed. 1894, sec. 623, p. 852, it is said :

" ' Where the charter requires the director to be a stockholder he must continue to hold stock during his term of office. · If he sells all his stock in the company he thereby becomes disqualified and ceases ipso facto to be a director. He may, however, remain a de facto director and bind the company by his acts if allowed to continue in his position.'

" In the present case Messrs. Guyer and Hoover parted with their stock; by so doing they lost their de jure right to their respective offices, [but did not they continue to be officers de facto? No election was held to fill the vacancies; no one assumed to discharge the duties of their respective offices.. Mr. Guyer was the custodian of the corporate seal of the company and of the stock books up to the date of the election in July, 1892, and if he was not president, de facto at least, on June 30, 1892, who was president?

" And to hold that a vacancy existed would be to disfranchise every share of stock that happened to be transferred,. because in such case there would be no officer to attest the transfer and make the entry in the books.] [7]

" [We are decidedly of the opinion that Mr. Guyer and Mr.. Hoover were officers, not, it is true, de jure but de facto on June 30, 1892, and, as such officers, that their issue to A. G. Morris on that day of a certificate for eight hundred and eight (808) shares of stock was legal and bound the company; and that Mr. Morris had a legal right to vote said stock at the election on July 4, 1892.] [8]

" In Cook on Stock and Stockholders, sec. 713, p. 1057, it is said:

" ' The contracts of an officer de facto, acting within the· sphere of his office, are binding upon the corporation.'

" Properly attesting the transfer of stock is an act peculiarly within the sphere of official duty; it is in the main ministerial; its performance, in general, in no wise increases the liabilities or alters the condition of the corporation.

" The legal question to which we have referred was most ably and elaborately argued before us. We will not attempt to reiterate the arguments pro and con, or to cite, much less to analyze, the mass of authorities presented to us. We have endeavored to examine all the authorities cited, to which we had access, and, while conflicting expressions may doubtless be

pointed out, we deem the foregoing citations from Cook on Stock and Stockholders to be a fair resumé of the law on the subject. The facts in none of the cases cited were analogous to the facts of the present case.

" The fifth point submitted by defendants asks us to rule that there can be no recovery in this action by Caleb Guyer as president because he was not a stockholder at the time of the election. Defendants' tenth point raises a similar objection in the case of G. W. Burket, director.

" The evidence is undisputed that, on the day of the election, both of these gentlemen were equitable owners and holders of stock. Mr. Guyer held a stock certificate but, by a clerical omission seemingly never noticed until during the trial of the case, his said certificate was not signed by the treasurer.

" This objection, at least so far as it relates to Dr. G. W. Burket, comes with rather bad grace from Messrs. Owens, Kloss and Walton, three of the defendants, as these three gentlemen are in a like predicament with Dr. Burket, that is to say, they were only equitable owners of stock on the day of the election.

" But the following citation from Cook on Stock and Stockholders, may be a sufficient answer to said objector.

" ' Although the charter requires the directors to be stockholders it has been held that the transferee and holder of a certificate of stock is qualified even though the stock itself stands on the books of the company in the name of the transferrer.' Cook on Stock and Stockholders, ed. 1894, sec. 623, p. 850.

" The conclusions arrived at by us may be summarized as follows. [We conclude :

" First. That the tellers erred in refusing to count two hundred (200) of the shares voted by A. G. Morris ; consequently Mr. Morris and the plaintiffs received a total vote of at least nine hundred and fifty-two (952) shares, legally qualified to vote, and were elected, as the defendants, against whom the jury rendered a verdict, at most only received a vote of eight hundred and eighty-six (886) shares.

" Second. Assuming that the tellers rightly refused to count the two hundred (200) so called Hoover shares, yet still plaintiffs were duly elected as they received the vote of at least

seven hundred and fifty-two (752) legally qualified shares while the defendants, against whom verdict was rendered, only received the vote of two hundred and fifty-five legally qualified shares.] [23]

" We answer the points reserved as follows :

" We affirm plaintiffs' first, second, third, fourth (these four points were affirmed pro forma at the trial) and sixth points. In the view we have taken of the case plaintiffs' seventh point becomes immaterial, but, if material, it may be considered to be affirmed. We likewise affirm defendants' first point. We deny plaintiffs' fifth point, and we likewise deny defendants' second, third, fourth, fifth, sixth, tenth and eleventh points.

" Upon payment to prothonotary of the jury fee we direct that judgment be entered on the verdict :

" That A. A. Stevens, defendant, shall be ousted and altogether excluded from the office, franchise, privilege and power of president of the Tyrone Gas and Water Company, and it is decided that Caleb Guyer was, on the 4th day of July, 1892, duly elected president of said corporation and shall hold possession of the said office until another shall be elected in his stead according to law and the regulations of said corporation ;

" That D. S. Kloss, defendant, shall be ousted and altogether excluded from the office, franchise, privilege and power of treasurer of the said Tyrone Gas and Water Company, and it is decided that Charles A. Morris was, on the 4th day of July, 1892, duly elected treasurer of said corporation and shall hold possession of the said office until another shall be elected in his stead according to law and the regulations of said corporation :

" That G. L. Owens, defendant, shall be ousted and altogether excluded from the office, franchise, privilege and power of secretary of the said Tyrone Gas and Water Company, and it is decided that Charles A. Morris was, on the 4th day of July, 1892, duly elected secretary of said corporation and shall hold possession of the said office until another shall be elected in his stead according to law and the regulations of said corporation ;

" That William Walton, D. S. Kloss and G. L. Owens, defendants, shall be ousted and altogether excluded from the office, franchise, privilege and power of directors or managers of the Tyrone Gas and Water Company, and it is decided that Dr.

G. W. Burket, Caleb Guyer and T. K. Morris were, on the 4th day of July, 1892, duly elected directors or managers of said corporation (in the place and stead of said William Walton, D. S. Kloss and G. L. Owens) and shall hold possession of said office until others shall be elected in their stead according to law and the regulations of said corporation ;

" That said defendants, A. A. Stevens, D. S. Kloss, G. L. Owens and Wm. Walton, jointly pay the costs."

*Errors assigned* were, among others, (1) overruling motion to quash ; (7, 8, 23, 24) portions of opinion on points reserved.

*H. M. Baldrige, G. H. Spang* and *Stevens & Owens* with him, for appellants.—Parties contesting for different offices cannot be joined in one and the same proceeding, either as plaintiffs or defendants : High on Ex. Leg. Rem. 704; Brewster's Practice, sec. 2106; People v. DeMill, 15 Mich. 164; Moock v. Conrad, 155 Pa. 536 ; Coopersdale Election, 157 Pa. 637.

It was the duty of the tellers to challenge any vote offered. That was the duty of objecting stockholders.   The duty of the tellers was only to receive the votes, pass upon any challenges made, and the legality of votes cast; and obey any orders that might be made to them by any court of competent jurisdiction ; compute the vote and announce the result.   The injunction served on the company and the tellers had, prior to the election, been served on A. G. Morris ; and he, disregarding the mandate of the court, cast his ballot, including the enjoined stock, into the hat.   How else could the tellers obey the injunction than by refusing to count, in the ballot cast by Morris, what, from the best information they had, would equal the Hoover stock.

*George B. Orlady, Hicks & Templeton* and *O. H. Hewit* with him, for appellees.—The relators were competent to sue : 1 Cook on Stock & Stockholders, 620 ; 17 Am. & Eng. Ency. of Law 53 ; Miller v. McCutchen, 2 Pars. Eq. Cas. 207 ; Com. v. Martin, 3 Lanc. Bar, 177 ; People v. DeMill, 15 Mich. 164.

The office of president, secretary or treasurer is but the result of being a director or manager of the corporation, and unless a director, the person cannot be a president, secretary or treasurer. So that there is nothing in the opinion of Judge LIVINGSTON

in Com. v. Martin, 3 Lanc. Bar, 177, which militates against the joinder of the defendants or the corelators in one and the same information: Moock v. Conrad, 155 Pa. 586; In re St. Lawrence Co., 44 N. J. L. Rep. 529; Com. v. Dillon, 61 Pa. 488.

The challenge to the vote about to be cast must be directed as to the number, and specific as to reason of challenge, and after the reception of the vote all the power of an officer is at an end, so far as the right to reject or throw it out for want of qualification of the vote is concerned; so that as soon as the vote is deposited in the box all control of the officer over it ceases, and he has no further power in the matter: 6 Am. & Eng. Ency. of Law, 307; Hartt v. Harvey, 32 Barb. (N. Y.) 55; Harbaugh v. Cicott, 33 Mich. 241; Reg. v. Donahgue, 15 Up. Can. Q. B. 454; Justice's Opinion, 70 Me. 560; State v. Donnewirth, 21 Ohio, 216; 19 Am. & Eng. Ency. of Law, 673; Com. v. Daltzel, 1 Dist. R. 657.

OPINION BY MR. JUSTICE MITCHELL, May 30, 1895:

The motion to quash the writ raised two questions, first, the standing of the relator to institute the proceedings, and secondly, the right to join the several defendants in one writ.

First, it is contended that the title of the relator to the office of director not being disputed he has no standing to question the title of the respondents to similar positions. But this view, as was well held by the learned judge below, overlooks the rights of the relator as a stockholder, to have his votes properly counted, and the affairs of the company committed to the charge of the officers legally elected by a majority of the stockholders. This is too clear to need further elaboration.

Secondly. The right to separate and distinct offices held by different incumbents, cannot in general be inquired into in one proceeding. But in this state the practice in quo warranto is regulated by the act of June 14, 1836, P. L. 621, and the eighth section provides that " if it shall appear to the court or judge (allowing the writ) that the several rights of different persons may be properly determined by one writ, it shall be lawful for such court or judge to make such order or orders for the introduction or addition of such persons into the writ, or for notice to such persons to appear and take defense, as shall be reasonable and just." The obvious purpose of this provision is to

bring the proceeding under the principle of equity practice, that the court having obtained jurisdiction of the subject-matter of controversy shall include all the parties to it, and make a final determination of the whole. This is in accordance with the general policy of the law, and the proper construction of remedial statutes. While the words are, the "several rights of different persons," and it is not expressly said that the title to different offices may be determined in one writ yet the latter case is not excluded by the language used, and may be equally within the intended remedy. It appears to be clearly so in the present case. Although the offices in controversy are different, yet the title of the incumbents as to all of them, depends on the same votes at the same election, and a decision on the validity of that election will be equally conclusive as to the rights of all. The case is therefore clearly within the privilege of the statute, and the learned judge was right in dismissing the motion to quash, and overruling the demurrer.

The cases of Moock v. Conrad, 155 Pa. 586, and Coopersdale Election, 157 Pa. 637, cited by both parties, have very little bearing on the present question, but so far as applicable they are in harmony with the conclusion herewith announced. In the former it was held on a motion to quash that a contest of the election of four councilmen might be commenced by a single petition where it "alleged fraud or mistake calculated to affect the entire ticket, and to destroy the returns as to each one of the set returned as elected," and that in case a joint trial would result in injustice or inconvenience, the respondents could sever in their answers, and ask the court to allow them to sever in their trials. In the Coopersdale Election case it was held by the court below, that to join contests for burgess, councilmen, school directors, justice of the peace, constable, and collector of taxes, in one petition would "complicate the proceedings, and involve the court in confusion as to questions of costs, evidence, and decrees, and compel persons having no joint interests to join in a defense," and this was affirmed by this court. Both those cases were decided upon the same principle, namely the practicability of determining the whole controversy in one proceeding without injustice or inconvenience, and of refusing the attempt unless those conditions appeared. In both those cases that principle was applied under the gen-

eral powers of the courts at common law. In the present case the same principle is applied under the additional sanction of express statutory authority. The difference in result arises from the difference in the facts and circumstances.

Upon the merits of the case, it appears that Morris was the holder of certificates of shares on which he was prima facie entitled to vote. The creditors of Hoover claimed title to 253 of the shares held by Morris, upon grounds that might authorize a court of equity to require Morris to transfer them, but gave no authority to the tellers to reject them in counting the vote. The action of the tellers must therefore be justified, if at all, by the terms of the injunction.

Very serious objections are raised to the mode of proceeding by the tellers in allowing the ballots to be deposited, and then rejecting them in the count without giving Morris any opportunity to be heard in defense of his right to vote them, and without any identification of the shares enjoined, or any evidence that such enjoined shares were included in those voted by Morris. It is however unnecessary to discuss these objections in detail, as it appears from the opinion of the learned court below on the points reserved, and even more clearly from the opinion of our brother DEAN while president judge, in continuing the injunction upon the Gas and Water Company against incurring any new debts pending the contest over the Hoover stock, that no effect upon the election, or the right of Morris to vote the stock thereat, was intended by the preliminary injunction. Neither the action of Morris therefore in voting the stock nor that of the tellers in receiving his votes, though contrary to the general language used in the injunction, was a violation of its real intent and meaning, and the nominal violation was no ground on which the later action of the tellers in rejecting the votes in the count could be sustained.

As this disposes of the whole controversy on the merits, the numerous assignments of error need not be discussed in detail.

Judgment affirmed.