# The Commonwealth *versus* Nesbit.

It is not a violation of the Act of 22d April 1794, for a hired domestic servant to drive his employer's family to church, on the Lord's day, in the employer's private conveyance.

The acts in favour of liberty of conscience are not inconsistent with the Sunday laws, or those for the suppression of vice and immorality. These are not intended to enforce religion, but to protect the social customs of the people of the Commonwealth.

In fulfilling the purposes of the day, the law recognises as proper, all the ordinary and usual means employed for such purposes, making all due allowance for the different circumstances in which people are placed.

This rule applies only to those occupations that fall within the purposes of the day, and not to those which are merely unforbidden. Some acts are not forbidden, and yet the usual means of executing them are.

All worldly employments are allowed which in their nature consist of acts of necessity or charity, or if they become so for the time being. In such cases, necessity and charity demand the work, and with it all the ordinary means of doing it.

Conducting and attending religious worship are among the very purposes for which the law protects the day; and, therefore, all the means which common usage shows to be reasonably necessary for these purposes, are not forbidden.

The law does not condemn those employments which society regards as necessary, even when they encroach on the Lord's day; if, according to the ordinary skill of the business, it be necessary to do so. And then, the business being recognised as necessary, it may be performed by means of the services of others, and by all the ordinary means of the business, so far as it is necessary.

The term "worldly employment," was not intended to include such household or family work as pertains directly to the proper duties, necessities, and comforts of the day; and this work may be done by any member of the family, including domestics.

The uniform practice of the country, in all times, proves that such employments are not forbidden by the law. Usually, the best argument in favour of a given interpretation of an old law, is to point to the usages of the country in its favour.

It is essential, that a summary conviction shall contain a finding that a special act has been performed by the defendant; and that it shall describe it, or define it, in such a way, as to individuate it, and show that it falls within an unlawful class of acts.

When the record contains no definite facts, but only a legal conclusion from unrecorded facts, a superior court cannot, without compelling a return of the evidence, or taking testimony of what it was, decide whether the legal conclusion—that is, the conviction of the offence—be right or wrong. In such cases, it usually reverses the conviction, because no act appears upon it, that justifies the judgment.

CERTIORARI to the Mayor of *Pittsburgh*.

This was an information against James Nesbit, for having performed worldly employment on the Lord's day, commonly called Sunday, contrary to the provisions of the Acts of 22d April 1794, and 26th April 1855.

The information was as follows:—

[The Commonwealth v. Nesbit.]

Commonwealth of Pennsylvania ⎫ Personally appeared be-
v. ⎬ fore me, Henry A. Weaver,
James Nesbit. ⎭ Mayor in and for the city
of Pittsburgh, James Reed, who being duly sworn, doth depose
and say, that on yesterday, being the 2d day of October, A. D.
1859, being the Lord's day, commonly called Sunday, he, the said
James Nesbit, at the city of Pittsburgh, county of Allegheny,
performed certain worldly employment or business on said day,
the same not being a work of necessity or charity, by driving cer-
tain horses to which was attached a carriage in which certain per-
sons, not travellers, but residents of the aforesaid county, were
carried over the streets of the city of Pittsburgh, and from the
said city, over and along certain roads within the aforesaid county,
contrary to the Act of Assembly of 1794, and its supplement
approved the 26th day of April 1855.

Complainant, therefore, desires that a warrant may issue, and
that the aforesaid defendant, James Nesbit, may be arrested and
held to answer this charge of performing worldly employment on
the Lord's day. And further deponent saith not.

JAMES REED.

Sworn and subscribed, this 3d of October 1859.

H. A. WEAVER, *Mayor.* [ L. S. ]

The following is a copy of the record before the Mayor:—

The Commonwealth ⎫ Charged on oath of James Reed with
v. ⎬ having done and performed worldly em-
James Nesbit. ⎭ ployment on the Lord's day, commonly
called Sunday. Warrant issued October 3d 1859. Same day,
defendant brought in, and entered into a recognisance for his
appearance for a hearing before me, on October 10th 1859. John
T. Logan tent. in $100, sub. con. that the defendant, James Nes-
bit, appear for hearing on above charge. And now, October
10th 1859, defendant appears, and after examination of witnesses
and hearing of evidence, case continued for decision to October
13th 1859. Be it remembered, that on the 13th day of October
1859, James Nesbit, of the county of Allegheny, and common-
wealth aforesaid, on consideration of the premises, is convicted
before me, Henry A. Weaver, Mayor of said city, at the city
aforesaid, of having, at the city aforesaid, done and performed
worldly employment and business, by driving certain horses
attached to a carriage, in which certain persons, not travellers,
were carried over the streets of said city, and along certain roads
within the aforesaid county; the same work, employment, or busi-
ness not being a work of necessity or charity, on the 2d day of
October, in the year aforesaid, being the Lord's day, commonly
called Sunday, contrary to the Act of General Assembly of 1794
in such case made and provided, and its supplement, approved the

[The Commonwealth *v.* Nesbit.]

26th day of April 1855. And I, the said Mayor, do adjudge him to forfeit and pay for the same offence, the sum of twenty-five dollars. Given under my hand and seal, at the county aforesaid, on the day and year last aforesaid.

H. A. WEAVER, *Mayor.* [ L. S. ]

The defendant, having been convicted of the alleged offence, applied for and obtained a special allowance of a *certiorari* to remove the proceedings to this court; and the record having been returned as above set forth, he suggested a diminution thereof, in this, that the mayor had not sent up the evidence on which the conviction was founded; whereupon the court awarded a writ of *certiorari* to bring up the same, to which the mayor made the following return :—

" To the Honorable the Judges of the Supreme Court of Pennsylvania :—

" The record and all proceedings, so full and entire as the same remain before me in the case of The Commonwealth *v.* James Nesbit, I have already certified under my hand and seal, as before commanded, to your Honourable Court, without any diminution thereof whatever. The testimony taken or heard before me, on the hearing of said case, was not made matter of record, being advised that the same formed no part thereof, under the Act of Assembly and the decisions of your Honours thereon. As to the alleged testimony set out in the foregoing writ, I am unable to certify that the same is correct. Witness my hand and seal, this 2d day of November, A. D. 1859.

." H. A. WEAVER, *Mayor.*" [ L. S. ]

The defendant thereupon applied for and obtained leave to take depositions, in order to ascertain what testimony was given before the mayor in this case.

From the depositions taken before the commissioner, it appeared, that the defendant was in the employment of John T. Logan, who resided in the city of Allegheny, as a gardener. That on Sunday, the 2d October 1859, he drove the carriage of his employer from his residence in Allegheny City, to the Second Presbyterian Church in the city of Pittsburgh, and back to the residence of his employer; which was the offence alleged against him before the mayor.

The defendant, in this court, assigned for error :—

1. The mayor erred in not setting out on the record of conviction the testimony taken before him on the trial of this case. 2. The mayor erred in not describing and setting out on the record the act of defendant complained of, explicitly and particularly, so as to enable the court to decide whether the said act was in violation of the Act of 22d April 1794, or not. 3. The evidence taken before the commissioner clearly shows that the defendant below

[The Commonwealth v. Nesbit.]

was not guilty of any violation of the Act of 22d April 1794. 4. The act of defendant set out on the record of conviction in this case, is not contrary to law. 5. The mayor erred in not setting out at large, on his record, the provisions of the Act of 26th April 1855, which is a private and local law, confined in its operation to the county of Allegheny.

*McKnight* and *Carnahan*, for the defendant below.—The magistrate ought to have spread upon the record the evidence on which the conviction was founded: *Paley on Convictions* 152–5, 161, 196, 205; 2 *Burr.* 1163; Commonwealth v. Cane, 2 *Pars.* 265; 10 *Mod.* 212; 2 *Str.* 919; 3 *Burr.* 1673; *Doug.* 469; *Cowp.* 728; 1 *Ash.* 411–12; 5 *Binn.* 29; 1 *Yeates* 251; 3 *Id.* 479; 1 *Ash.* 215.

The act of which the defendant has been convicted is no violation of the Act of 1794. It is included within the proviso to that act: Johnston v. Commonwealth, 10 *Harris* 108; Jones v. Hughes, 5 *S. & R.* 299. Christianity is a part of the common law of Pennsylvania, as has been frequently decided by this court; and the Sabbath day has always, in every Christian country, been observed by attendance on religious worship. In Pennsylvania, perhaps more than any other state or country, has the day been so observed.

The Act of 1794 was not intended to compel an observance of the Sabbath, but to protect it from violation; and, so far as known to us, this is the first time in Pennsylvania that the act of driving a carriage to church has been held to be a violation of the Act of 1794. Contemporaneous construction, common usage, and the terms of the statute itself, are all against such an interpretation. In this case, the defendant below was himself in attendance upon religious worship, and to hold that he committed a crime by driving to the same church a carriage, in which himself and others were seated, is simply absurd. As well may it be said, that the sexton who opens the church-doors on the Sabbath day, or lights a fire in the church for the comfort of those assembled to worship Almighty God, commits a crime which may subject him to fine and imprisonment.

*Williams* and *Howard*, for the Commonwealth.—The Act of Assembly, under which these proceedings are had, gives a form of conviction; and it is not necessary to set out the evidence: Commonwealth v. Hardy, 1 *Ash.* 410; Commonwealth v. Wolf, 3 *S. & R.* 48; Johnston v. Commonwealth, 10 *Harris* 102. Where a statutory form is given, the justice need not set out the evidence: *Paley on Convictions* 424.

This court has decided that the driving of a public conveyance on Sunday is a violation of the law: 10 *Harris* 100. And that

the worldly employment forbidden need not amount to a breach of the peace: 1 *S. & R.* 347. The common law has adopted the obligation of observing the Lord's day, because it is the law of God, and a part of the Christian religion: *Exodus* ch. 20, v. 9–10; *Genesis* ch. 2, v. 3; *Exodus* ch. 22, v. 11; *Deuteronomy* ch. 4, v. 2; *Id.* ch. 5, v. 13, 14. And if they now hold, that the driving of a private conveyance is lawful, a distinction is made against the poor, which the law of God does not sanction.

When the court decide that the "private conveyance" is lawful, and the public conveyance is not, it is true, the court does not make any distinction; but God, in his providence, has made a distinction, or the fortune of the world has made a distinction, and this matter is known to the legislature and the court; then the *effect* of the construction given is to cut off those who are unable to keep up a private conveyance, from the privilege of riding on Sunday. Why? Because the driver, that takes five cents from them, is liable to be prosecuted. Suppose it should be said, that the driver of the public conveyance may take *for hire* persons in and out of the city on Sunday, to attend church. How is the driver of the public conveyance to tell who *is* going to church and who not? He *cannot do it*—it is impossible, and because this is *impossible*, and if he should carry *some* that should not go to church, he would be liable to the penalty. If the court should say, that the driver might take persons to *church*, and yet leave him exposed to a criminal prosecution, if he carried those who did not go,—the driver will not carry any, because it is impossible for him to determine who is and who is not going to church. Therefore it is, that under such a construction of the statute, the great mass of the people will, from the "necessity" of the case, be left without any conveyance at all. It makes little difference *how* the people are deprived of their conveyance, so that it is practically done.

The case of Johnston *v.* Commonwealth, 10 *Harris* 115, reads, "The right of the poor to *rest* from labour, without diminution of wages, or loss of employment—the right of beasts of burden to repose one-seventh of their time—these are the real interests the legislature intended to secure." How long would the "poor" driver remain "employed," if he should refuse to get the horses ready, and drive the owner and his family to church on Sunday? And if the legislature intended horses should not be worked on Sunday, what right has any one to make them work? We are aware, that this mode of treating the Sabbath, and requiring a strict observance of it according to the *divine command*, is not fashionable in this day and generation. The Pharisees have disappeared long since, but it is feared their principles have descended to a portion of the present generation.

[The Commonwealth *v.* Nesbit.]

The opinion of the court was delivered by

Lowrie, C. J.—The technical formalities of an old summary conviction are much beyond the ordinary skill of justices of the peace in this country; and for this and other reasons, some parts of them have been much condemned in modern legislation. But it is still essential, that a summary conviction shall contain a finding that a special act has been performed by the defendant; and that it shall describe or define it, in such a way, as to individuate it, and show that it falls within an unlawful class of acts. Without this, a judgment that the law has been violated, goes for nothing.

Now, this is not merely a formal or technical rule of summary convictions, but a most essential and substantial one. No citizen could have any sort of protection against the ignorance or wickedness of inferior magistrates, if these were authorized to convict citizens of offences, and yet allowed so to record their proceedings, that the very act done, cannot be ascertained, and thus their judgment cannot be tested by their judicial superiors.

The most common purpose for which inferior tribunals are reviewed by their superiors is, in order to correct their erroneous applications of law to ascertained facts. But when the record contains no definite facts, but only a legal conclusion from unrerecorded facts, the superior court cannot, without compelling a return of the evidence, or taking testimony of what it was, decide whether the legal conclusion, that is, the conviction of the offence, is right or wrong. In such a case, for the safety of the citizen, they usually reverse the conviction, simply because no act appears upon it that justifies the judgment. And this rule applies not only to summary convictions, but to indictments and trials by jury in the higher courts, and generally, even to judgments in civil actions there. A sentence is reversed, if the record do not show the commission of a well-defined act that is forbidden by law.

Now, let us see what act the defendant here is found to have committed. He is convicted, leaving out redundant words, of having "performed worldly employment, by driving, on Sunday, a carriage, in which were certain persons, not travellers, the same employment not being a work of necessity or charity."

Nobody supposes that driving a carriage is ever, by itself, a work of necessity or charity, though it may be a means by which all sorts of works, including those of necessity and charity, are performed. We, therefore, for the sake of simplicity, throw out these words. The words, "worldly employment" are the magistrate's judgment concerning the fact, and we leave these out, and then we have the naked definition of the act, thus: Driving a carriage on Sunday, with persons in it, who were not travellers.

[The Commonwealth *v.* Nesbit.]

Does this description contain all the elements of an offence against the law?

It will be seen at once, that if the defendant had been driving his own family to church on the Lord's day, he would have been doing the very act that is here charged. If, then, this conviction stand affirmed by us, it will be equivalent to a decision by this court, that a man cannot drive his family to church on the Lord's day without transgressing the law; because he will be driving, on Sunday, a carriage, with persons in it who are not travellers. For anything appearing on this record, the defendant has done no other or worse act than this, and of course this conviction must be reversed, for no sensible man supposes that the law forbids such an act.

But we must not dismiss this case thus summarily. The magistrate did not truly record the act done, and declined to send up any correction of his record. But we do not need to discuss his duty in this regard, for the counsel on both sides admit the only elements of the act that were wanting. According to the truth, the conviction ought to have found that the defendant, as a hired domestic servant, drove his employer's family to church on the Lord's day. Is this an unlawful act?

No member of this court has any doubt or hesitation in saying that it is not. No man, having a reasonable respect for the ordinary customs and usages of the country, could ever originate a doubt about it. Since the settlement of the country, we have had substantially the same law on this subject; and under it, this sort of act has always been deemed lawful, as is shown by the fact that it has always been practised, and that its lawfulness has never been questioned. And surely, the uniform practical interpretation of a law for near two centuries, is an argument that is worth more than hours of refined criticism and analysis of its phraseology. It is the expression of the common sense of the country, and therefore the argument which common sense most readily appreciates.

We repeat, therefore, that men who respect the common sense of the country, could not *originate* a doubt about the lawfulness of the defendant's act. They might confuse themselves, by substituting their interpretation of a divine law on the same subject, in place of the civil law, which alone can be judicially applied, or they might be embarrassed, and perhaps misled, by objections and arguments invented or retailed by others; but this is only because they have not so studied the subject as to be ready with an answer. Usually, the best argument in favour of a given interpretation of an old law, is to point to the usages of the country in its favour. Minds respectful of society admit such arguments cheerfully. Minds that have no such respect need to be educated over again, rather than argued with. Applying the argument

from common usage, to this case, this conviction is very plainly erroneous; whether it means to say that a man cannot lawfully drive his family, or a hired man his employer's family, to church on the Sabbath.

And though an analytic argument is almost always weak and wearisome, and a long one can never have the force of a short oné that is comprehended, we think that it can be perfectly and clearly shown, from the purposes and terms of the law, that it does not include the act here charged. We cannot do this without using more words than we like to trouble people with; but we shall be as saving of their time as our own time will allow. We shall, for the sake of clearness, drop all redundant words even in quoting Acts of Assembly. The discussion will add clearness to the convictions derived from the argument founded on general usage.

Let us inquire *why* people are forbidden to carry on their worldly business on the Sabbath? Our brother WOODWARD has already shown, that it is in order that people may devote the day to rest, and to the worship of God: 9 *Harris* 432; 10 *Id.* 111. Our first law on this subject was the 36th of the laws agreed upon in England, May 5th 1682, which declares the purpose to be "for the ease of creation, and that people may the better dispose themselves to worship God, according to their understandings." The very first law of the first General Assembly of Pennsylvania was on this subject, and was passed at Chester, December 7th 1682. It declares, that "for the ease of creation, people shall abstain from their usual and common toil and labour, that they may the better dispose themselves to read the scriptures of truth at home, and frequent meetings of religious worship." This law was re-enacted in 1700, and again in 1705, in nearly the same words. These re-enactments were, doubtless, rendered necessary by repeals in council. The English statute which served, in some measure, as a model for all these, was passed in 1676 (29 Car. 2, c. 7), and goes much further, for it *requires* people to observe the day, "by exercising themselves in the duties of piety and true religion, publicly and privately."

We should, no doubt, differ very widely in our modes of expressing what ought to be the purposes and reason of the Sabbath, as a civil institution. Such differences are inevitable; for people always know their moral and physical wants much better than the reasons or the remedy for them. They must have institutions according to their wants, whether they can give philosophical reasons for them or not. And so long as they are unable to distinguish clearly between religion, morality, and law, it is of their very nature, that their political institutions must be more or less theocratical or religious. No number of rational principles, set

[The Commonwealth *v.* Nesbit.]

in array in bills of rights, can prevent this.   The natural order
of events cannot be arrested by such barriers.

We are not forgetting that the public acts of our Pennsylvania
ancestors abound with declarations in favour of liberty of con-
science, and that some regard these declarations as inconsistent
with the Sunday laws.   But a little reflection shows, that they
indicate the moral ideal to which all government ought to ap-
proach as nearly as possible, rather than a positive principle of
legislation.   And in applying such declarations, we must bear in
mind, that they proceeded from an earnestly Christian people, and
must receive a practical interpretation.

They never thought of tolerating paganism, or the principle of
ecclesiastical supremacy in civil affairs, on the ground of liberty
of conscience.   They could not admit this, as a civil justification
of human sacrifices, or parricide, or infanticide, or thuggism, or of
such modes of worship as the disgusting and corrupting rites
of the Dionysia, and Aphrodisia, and Eleusinia, and other festi-
vals of Greece and Rome.

They did not mean that the pure, moral customs which Christi-
anity has introduced, should be without legal protection, because
some pagan, or other religionist, or anti-religionist, should advo-
cate, as matter of conscience, concubinage, polygamy, incest,
free love, and free divorce, or any of them.

They did not mean, that phallic processions and satyric dances,
and obscene songs, and indecent statues, and paintings of ancient
or of modern paganism, might be introduced, under the profession
of religion, or pleasure, or conscience, to seduce the young and
the ignorant into a Corinthian degradation; to offend the moral
sentiment of a refined Christian people; and to compel Christian
modesty to associate with the nudity and impurity of Polynesian,
or of Spartan women.   No Christian people could possibly allow
such things.   No written law, founded on such bald and impotent
rationalism, could present the slightest obstacle to the sentiment
and action of a people in opposition to such things.

Every Christian man is sure, that it is his religion that has sup-
pressed the pagan customs just alluded to, and that to it is due
the large advance in justice, benevolence, truth, and purity that
belongs to modern civilization; that it has purified and elevated
the family relations; that it has so elevated the moral standards
of society, that the indecencies, and cruelties, and cheats, of pagan-
ism are now condemned by custom and by law, as crimes.   And
he is very sure, that the Sabbath and its institutions were the pro-
minent means of this progress, and are essential to its mainte-
nance and continuance.

How, then, is it possible for a Christian people to avoid pro-
tecting such a day and its institutions?   If there are men who
oppose them as superstitions, let them at least respect them as

[The Commonwealth *v.* Nesbit.]

essential constituents of the people's life, which cannot possibly be laid aside at will. If strangers to our institutions dislike these particular ones, let them accord a reasonable respect to us, and indulgence to our customs, and they will soon be reconciled to both, and find other matters more needing their reforming efforts. If they have better principles than we have, we cannot reject them, unless they are presented to our minds with disrespectful rudeness, and then we must reject them. Disrespectful argumentation is a violation of mental rights, and is therefore resented. The cause that succeeds in the use of it, succeeds rather in spite of its arguments than by them.

. By our Sunday laws, and our other laws against vice and immorality, we do not mean to enforce religion; we admit that to be impossible. But we do mean to protect our customs, no matter that they may have originated in our religion; for they are essential parts of our social life. Instinctively, we defend and protect them. It is mere social self-defence, and not a matter of choice. In doing so, we must be as generous toward those who differ from us, as we know how to be, or as circumstances will allow us to be. No more than this can reasonably be expected of us.

But we have ascertained the purposes for which the day is protected: let us notice another principle heretofore pointed out by our brother WOODWARD—" that no means reasonably necessary for these ends (the general purposes of the day) can be regarded as prohibited :" 10 *Harris* 111.

Let us endeavour to seize this thought fully and clearly. Law regards all those means as reasonably necessary for a purpose, which society recognises as the ordinary and usual means, under existing circumstances. We may, therefore, modify the expression thus: in fulfilling the purposes of the day, the law recognises as proper, all the ordinary and usual means employed for such purposes, making all due allowance for the different circumstances in which people are placed.

Let it be noticed, that this rule applies only to those occupations that fall within the purposes of the day, and not to those which are merely unforbidden. Some acts are not forbidden, and yet the usual means of executing them are. Fuel, and food, and clothing, are not forbidden, yet the usual means of obtaining them, by merchants, manufacturers, carriers, farmers, gardeners, and labourers, are forbidden.

On the other hand, a special purpose of the day is, that people may enjoy religious worship and instruction, and hence, the functions of the preacher, the religious teacher, the sexton, the organist, and the singers, are not forbidden, even though these persons engage in these employments as a means of livelihood. Hence, also, the ordinary means of attending public worship are not for-

[The Commonwealth *v.* Nesbit.]

bidden, when used purely for this purpose.  In this view of the case, it is the rightness and the exigencies of the purpose that justify the ordinary means of effectuating it. , Conducting and attending religious worship are among the very purposes for which the law protects the day, and therefore all the means which common usage shows to be reasonably necessary for these purposes, are not forbidden.

Some worldly employments are expressly allowed, such as removing with one's family, delivery of milk and necessaries of life, and the business of ferrymen and innkeepers ; and, of course, these may be performed by a principal, or by his servants, and by all the ordinary means adopted for these purposes, and which are not themselves forbidden.

And all worldly employments are allowed, which, in their nature, consist of acts of necessity or charity ; or if they become so for the time being, by reason of famine, flood, fire, pestilence, or other disaster.  In such cases, necessity and charity demand the work, and with it, all the ordinary means of doing it.  The whole purpose of some employments is to do works of necessity or charity.

The business of a physician cannot be stopped on Sunday, because it is a work of necessity.  He must travel in performing it, and he is, therefore, entitled to use all the ordinary means of such travel, and this includes, of course, the labour of his servants, in attending to his horse and carriage, and in driving, if he think it needful.    The law does not inquire whether he might have done such work himself.   It is not the driving, but the principal work that is needful; the driving follows merely as ordinary means.

The business of the apothecary is necessary, so far as it is connected with human sickness, and a man may attend to it by his servants, though that means may not be necessary.   Hospitals, in great variety, are necessary, and no one doubts that all the domestic attendants of these institutions may lawfully pursue their usual avocations therein, because they are the ordinary means of a legitimate purpose.

But no one ought to expect sharp definitions of legal duty on such a subject.   Modes of living, of business, of travel, and other human customs, are so continually changing, that definitions involving them can never be universally, but only generally, adequate.   All that we can expect is truth and accuracy to a general intent.   Even law, as a definition of human duty, is subject to this defect.   Yet, with very few exceptions, it is true, that no one who sincerely respects the customs of society, and strives to maintain them in his social life, can fail to understand the law in all its main features, and to live in conformity with it.   It is only in peculiar and exceptional cases, that any difficulties can arise, and even these are made easy of solution, by a sincere disposition to conform to the order of society.

[The Commonwealth v. Nesbit.]

Necessity itself is totally incapable of any sharp definition. What is a mere luxury, or perhaps entirely useless or burdensome to a savage, may be a matter of necessity to a civilized man. What may be a mere luxury or pleasure to a poor man, may be a necessity when he has grown rich. Necessity, therefore, can itself be only approximately defined. The law regards that as necessary, which the common sense of the country, in its ordinary modes of doing its business, regards as necessary.

By this test, the business of keeping a livery-stable for the care of people's horses, is a necessary employment in large towns, and, of course, this requires some work and attention on Sundays, and this may be performed to the extent of the necessity, by the ordinary means belonging to the business.

By this test, also, iron and glass are necessaries of life, and they cannot be obtained without some work being done on Sundays, if the business is to be performed according to the ordinary skill and science of the country. The law never inquires whether iron and glass generally, or in such large quantities, are really necessary, in the strictest sense of the word, or whether it is not possible to improve the art, so that Sunday may not need to be violated. This is not the province of law, but of individual enterprise and science.

Law, therefore, does not condemn those employments which society regards as necessary, even when they encroach on the Sabbath; if, according to the ordinary skill of the business, it is necessary to do so. And then, the business being recognised as necessary, it may be performed by means of the services of others, and by all the ordinary means of the business, so far as it is necessary.

But let us consider the statutory definition of what is forbidden. It is "any *worldly* employment or business whatsoever." What does this word "worldly" mean? Its correlatives help us to its meaning. Very evidently, worldly is contrasted with religious, and the worldly employments are prohibited for the sake of the religious ones. Of course, therefore, no religious employments are forbidden. Hence, funerals, as religious rites, are allowed on Sundays, and all the functions of undertakers, grave-diggers, hearse and carriage drivers, and others; though such persons use such employments as a means of livelihood. Hence, also, while purely civil contracts are forbidden on Sundays, marriage is not so, because it is not purely a civil, but also a religious contract.

But the words domestic, household, and family, are also correlatives of the word worldly. If they are so in this law, then worldly employments being alone forbidden, of course these contraries are not. An obstacle to this view is, that cooking victuals in families is excepted, as though the general prohibition of worldly employments included it. Yet this exception is possibly

expressed by way of precaution, to prevent a supposed, but perhaps misinterpreted Jewish law, from being misapplied to us, as though repeated in our law: *Exodus* xvi. 23, and xxxv. 3. Or possibly, the purpose of the proviso was, to save from the prohibition certain worldly employments, such as cooking victuals in bake-houses, boarding-houses, and inns, and delivery of milk; and cooking in families was also named merely to prevent a prohibition of it from being implied from the proviso, though not included in the general prohibition.  If this is a redundancy, it is not the only one.  Cooking victuals in bake-houses and inns is specially allowed, and yet it is understood to be included under the term "works of necessity:" 2 *Burr.* 787; 5 *Term R.* 449. And if "worldly employment" is to be taken in its largest sense, it includes hunting, shooting, and sporting, and yet these are specially forbidden.

These considerations seem to demand some limitation of the term "worldly business," and we are aided in making it, by the Act of 1705, where it is treated as "work of their ordinary callings."  So also it is explained in the statute 29 Car. 2, c. 7.  We think that these terms were not intended to include such household or family work as pertains directly to the proper duties, necessities, and comforts of the day; and this work may be done by any member of the family, including domestics.

The most convincing proof that this is the true interpretation of the law, is, that it has always been so understood.  It has never been regarded as applying to the proper internal economy of the family.  It does not except the ordinary employments of making fires and beds, cleaning up chambers and fire-places, washing dishes, feeding cattle, and harnessing horses for going to church, because these were never regarded as the worldly business of the family, and therefore not forbidden to the head of the family, or to any of the domestics.  It is probable, however, that the most of these occupations may have been regarded as works of necessity, or as means of performing such works.

The uniform practice of the country, in all times, proves at least, that such employments are not forbidden by the law.  It certainly never was intended, that the law should enter as a spy into every man's family, in order to inspect his domestic arrangements, and ascertain whether he is improperly employing his domestic servants there, or is himself doing work which strict religious principle would forbid.  Law does not and cannot direct the division and apportionment of labour among the members of the family. Our law has always considered a man's home too sacred to be subjected to such espionage.  Law cannot descend to such functions, and surely religion can neither require nor perform them.

These domestic employments being necessary for every day, and not worldly employments in the sense of the law, may be

[The Commonwealth v. Nesbit.]

exercised in the ordinary modes, and with the ordinary freedom of the family, without any violation of the law. Such is the act of which this defendant was convicted, and in so acting he was guiltless.

Guiltless before the civil law, by the divine law, as such merely, we have no authority to judge him. This, in many, not to say all of its elements, consists of moral and religious ideals that are much above our present acquisitions, and therefore we cannot enforce it. Whereas law, civil law, in its truest character, expresses the common sense and common morality of the country, and, therefore, is easily understood, obeyed, and enforced. We recognise in thought, that law and faith, or law and religion, consist of distinct classes of principles, and are enforced by essentially different means; yet it is as impossible to make a complete separation of them, as it is to separate reason from sentiment in actual humanity. Law can never become entirely infidel; for it is essentially founded on the moral customs of men, and the very generating principle of these is most frequently religion. Our civil law does not condemn the defendant.

The conviction is reversed.