## Commonwealth ex rel. Attorney-General v. Sesqui-Centennial Exhibition Association.

*Sunday law — Corporations — Quo warranto — Jurisdiction — Worldly employment—Acts of April 22, 1794, and June 14, 1836—Evidence—Exhibitions.*

1. *Quo warranto*, under the Act of June 14, 1836, P. L. 621, in the Court of Common Pleas of Dauphin County, at the relation of the Attorney-General, is a proper remedy to determine whether the Sesqui-Centennial Exhibition Association, organized as a corporation, not for profit, under the Act of June 14, 1887, P. L. 383, and conducting an exhibition in Philadelphia County, has the right to open its gates on Sundays and charge an admission fee for entrance.

2. The fact that the Sunday Act of April 22, 1794, 3 Sm. Laws, 177, carries the penalty for its violation, does not oust the jurisdiction of the Dauphin County court in *quo warranto* proceedings.

3. The Act of 1794 is a penal statute. *Quo warranto* is a civil remedy. The purposes of the two remedies are entirely different; one is to punish the offence, the other to protect the sovereign state and the public so that corporations shall exercise only those powers and privileges granted to them.

4. In a *quo warranto* proceeding against the Sesqui-Centennial Association to enforce the Sunday law, the Director General of the Exhibition may be called as a witness for cross-examination.

5. The collection of compulsory admission fees at the entrance of the Sesqui-Centennial Exhibition on Sunday is a worldly employment within the meaning of the Act of April 22, 1794, 3 Sm. Laws, 177.

6. The business of the Sesqui-Centennial Exhibition Association is the conducting of an exhibition, and this is "worldly" employment or business as those words are used in the act.

7. Such a business is not a work of either "necessity" or "charity" and is not within the exception of the act.

8. The fact that the Association is not for profit and that it is a great educational institution does not render it a charity.

9. That no additional charge is made for the amusements and diversions on Sunday does not affect the fact that the conduct of the Exhibition with its charge for general admission is a worldly employment.

10. The selling of souvenirs in the Exhibition grounds on Sunday is not a work of necessity.

11. Amusements and recreations within the grounds on Sunday are worldly and neither works of necessity nor works of charity.

*Quo warranto.* C. P. Dauphin Co., Commonwealth Docket, 1926, No. 61.

*George W. Woodruff*, Attorney-General, and *John Robert Jones*, Deputy Attorney-General, for relator.

*Joseph P. Gaffney*, City Solicitor of Philadelphia, and *Francis Shunk Brown*, for respondent.

HARGEST, P. J., Sept. 16, 1926.—The Attorney-General filed his suggestion for a writ of *quo warranto* to require the respondent to show by what authority it conducts the Sesqui-Centennial Exhibition on Sundays, to which it charges an admission fee, wherein goods, wares and merchandise are sold and amusements and diversions conducted; and also to show by what authority it licenses, permits and sanctions the sale of goods and the operation of such amusements on that day. The respondent filed its answer, averring that the Exhibition conducted by it is charitable and educational in its nature and that it violates no law by permitting said Exhibition to be open on Sundays, for which an admission fee is charged, or by permitting the amusements which are therein conducted to be open without charging a separate admission fee therefor. It also avers that the Exposition cannot be successfully carried on if it shall be closed on Sundays, and denies the jurisdiction of the court to entertain this proceeding. The relator filed a reply, whereupon the case was

heard by the court without the intervention of a jury, under a stipulation filed pursuant to the Act of April 22, 1874, P. L. 109.

*Facts.*

The facts have been separately found in answers to requests of both parties and filed herewith, but for convenience we may restate briefly those upon which our conclusion largely rests.

The Sesqui-Centennial Exhibition Association was incorporated May 9, 1921, pursuant to the Act of June 14, 1887, P. L. 383. It is not a corporation for profit. It is formed for the purpose of conducting, in the City of Philadelphia, an exhibit of the progress of the United States in art, science and industry, trade and commerce, to celebrate the one hundred and fiftieth anniversary of the signing of the Declaration of Independence. The directors of said association directed the Exposition to be opened on Sundays, and, beginning July 4, 1926, the said Exhibition has been open on Sundays. The said Exhibition covers a large area of ground, approximately 1000 acres; great buildings have been erected; exhibits of all character in the arts, science and industry are displayed; many classes of recreational amusements are conducted, such as theatres, a switchback railroad, a carousal, the panorama of the battle of Gettysburg, Fire and Flame, which is a reproduction of descriptive conditions in the tenement districts of large cities; Tunisian village, portraying the activities of Tunisian life, and many others.

The respondent has entered into contracts for exhibits with sale privileges, and with concessionaires for conducting and operating amusements of the character above referred to. Many of these contracts provide for a percentage, to be paid to the Exhibition Association, based upon receipts or the invoice price of goods. There is within the grounds a space set apart exclusively for amusements, called the "Gladway," which covers approximately eighty acres, but the amusements are also scattered over the grounds. The Exposition has a large number of employees and about 2000 are on duty on Sundays. The concessionaires also employ from 1500 to 2000 people. Replicas of the Liberty Bell and the Declaration of Independence Hall are stamped or printed on souvenirs of all kinds, such as spoons, large pencils, paper weights and novelties.

The order directing the Exposition to be opened on Sunday provided:

"There can be no selling of merchandise on Sundays, no solicitation or 'barking.' Sales must be confined wholly to foods and beverages."

Later on an order was addressed to all concessionaires, which provided:

"Sales within the Exposition grounds on Sunday must be confined to foods, beverages and 'official souvenirs' of the Exposition. For the purpose of these instructions, the term 'official souvenirs' means articles which have been made up as souvenirs of the Sesqui-Centennial International Exposition and have been so marked in the process of manufacture; articles emblematic of the Exposition, such as replicas of the Liberty Bell, Independence Hall, copies of the Declaration of Independence and similar emblematic articles. Novelties and other articles of merchandise cannot be classed as 'official souvenirs,' notwithstanding that they may bear stickers, rubber stamps or other quickly and especially devised markings indicating that they are official souvenirs. Articles of merchandise cannot be converted into official souvenirs by placing them in boxes or other containers so marked. No donations may be solicited. No charges may be made for amusements. No oriental dance nor show of similar character will be permitted to open."

The theatres were not permitted to be open on Sundays. While no additional charge is made for recreations and amusements on Sundays, the Exhi-

DISTRICT AND COUNTY REPORTS. 79

Com. ex rel. Attorney-General v. Sesqui-Centennial Exhibition Association.

bition Association pays to each concessionaire whose place is operated on those days an amount which will cover their depreciation, their operating expenses of every nature, and a certain percentage to cover the overhead for the officers of the company whose time cannot be directly distributed against a day's operation. To illustrate: For each Sunday $3000 is paid for Treasure Island, $1800 for Fire and Flame, $1000 for the Battle of Gettysburg, $200 for the Scooter. Notwithstanding the order against sales of merchandise which cannot properly be classed as "official souvenirs," sales of such merchandise have been made on Sundays and "barking" has been carried on.

### Discussion.

At the threshold of this case the respondent raises the question of jurisdiction. While the pleadings raise the general question, we do not understand it to be contended that this court does not have jurisdiction generally in proceedings in *quo warranto* against corporations of the State, at the relation of the Attorney-General, and, indeed, we are of opinion that this is no longer an open question, in view of the irresistible logic of the opinion of Simonton, P. J., in the case of Com. v. Penna., Slat. & New Eng. R. R. Co., 2 Dauphin Co. Reps. 283. See, also, Com. ex rel. Attorney-General v. Order of Solon, 166 Pa. 33, 38, and Com. ex rel. Attorney-General v. Wilkins, 271 Pa. 523, 526.

The respondent, however, denies that *quo warranto* is the proper remedy. This requires us to consider somewhat the nature and character of that proceeding. *Quo warranto* is the appropriate writ for the forfeiture of a charter or the ouster of a corporation from using powers and privileges which it does not possess. It is not a criminal proceeding, but is essentially a civil proceeding, remedial in its nature: Respublica v. Wray, 2 Yeates, 429; Com. v. Philadelphia County Commissioners, 1 S. & R. 382; Com. v. Burrell, 7 Pa. 34.

Judge King, in Miller v. McCutchen, 2 Parsons, 205, 211, said: "Our clear duty is to give such a construction of this act (Act of 1836) as will advance the remedies it was intended to impart, not to nullify them in effect, by giving it one too narrow."

In Com. v. Stevens, 168 Pa. 582, 587, the Supreme Court, speaking of the Act of 1836, said:

"This statute is remedial and is to be so construed and administered as to advance, that is, to render effective, the remedy: Com. v. Dillon, 61 Pa. 488."

"A corporation, by the very terms and nature of its political existence, is subject to dissolution by forfeiture of its franchises for wilful misuser or non-user:" Storey, J., in Mumma v. Potomac Co., 8 Pet. 287, quoted in Com. v. Commercial Bank, 28 Pa. 383, 389.

"Implied duties are equally obligatory with duties expressed, and their breach is visited by the same consequences:" Com. v. Commercial Bank, 28 Pa. 383, 389.

There can be no doubt that a corporation may be ousted from exercising powers that are not granted to it, or from doing *ultra vires* acts, while at the same time its right to exercise those powers which are conferred will be preserved: Com. v. Philadelphia Inquirer, 3 Dist. R. 742, 15 Pa. C. C. Reps. 463; Com. v. Mutual Aid Union and Beneficial Ass'n, 7 Dauphin Co. Reps. 312; Com. v. Equitable Beneficial Ass'n, 6 Dauphin Co. Reps. 31.

*Quo warranto* is the proper remdy against corporations of both the first and the second classes: Perrenod's Petition, 8 Dauphin Co. Reps. 74, 31 Pa. C. C. Reps. 226; Miller v. McCutchen, 2 Parsons, 205, 211.

When a corporation is attempting to exercise powers that it does not possess, the Commonwealth is concerned, and the writ of *quo warranto* must be

at the relation of the Attorney-General or some authorized agent of the Commonwealth and cannot be upon the suggestion of a mere private relator: Murphy v. Farmers' Bank of Schuylkill County, 20 Pa. 415; Com. v. Commercial Bank, 28 Pa. 383, 391.

Section 3 of the Act of June 14, 1836, P. L. 621, provides: "Whenever the Attorney-General shall have reason to believe that any association as aforesaid have acted as a corporation, or exercised any of the franchises or privileges thereof, without lawful authority, or that any corporation has forfeited its corporate rights, privileges or franchises, as aforesaid, or exercised any power, privilege or franchise, not granted or appertaining to such corporation, it shall be his duty to file, or cause to be filed, a suggestion as aforesaid, and to proceed thereon for the determination of the matter."

There is no doubt that quo warranto is an extraordinary remedy and the court should proceed with extreme caution: Com. v. Monongahela Co., 216 Pa. 108, 116.

The respondent contends that when the corporation is generally fulfilling the design and purpose of its organization, quo warranto will not lie to oust it of powers that it is attempting to exercise beyond its general design and purpose. To adopt this contention would be to violate the principles of construction with reference to remedial statutes. Nor can there be any doubt, as pointed out at length by Mr. Justice Mitchell, in Malone v. Gas Light Co., 182 Pa. 309, 321, et seq., that a corporation may exercise those powers that are incidental to the full and proper use of its charter privileges. But that principle does not go to the length of investing a corporation with the right to violate the law in the exercise of powers which it claims are incidental to the charter powers granted by the Commonwealth. Quo warranto is, therefore, the appropriate remedy to restrain any ultra vires acts which are claimed as incidental to the exercise of the lawful powers of a corporation.

The respondent also claims that, because the Act of 1794 carries the penalty for its violation, quo warranto will not lie. This contention raises a question of serious concern to the Commonwealth which reaches far beyond the importance of the instant case, important as that may be. It goes to the length of asserting that the Commonwealth, at the relation of the Attorney-General, may, by quo warranto, contend that a corporation is doing an ultra vires act or abusing its charter privileges, provided the act complained of does not arise to the seriousness of a crime or offence for which the law has provided a specific punishment. If it is so serious an offence that the legislature has seen fit to prescribe punishment, then the corporation can proceed with impunity to exercise the powers that it does not have. Such a position cannot be sound. Could it be said that a corporation not organized for manufacturing could engage in manufacturing, pollute one of the important streams of the Commonwealth and thereby maintain a great nuisance, and that the Commonwealth could not question the abuse of its charter powers because there was a specific punishment for maintaining a nuisance? As was said by Mr. Justice Thompson in Com. v. Dillon, 61 Pa. 490: "It is of consequence to the Commonwealth to retain the right of judicial action in regard to corporations created by her laws."

In Northern Central Ry. v. Com., 90 Pa. 300, the railway company was indicted for nuisance in obstructing a turnpike road. It was contended that, for injury to its rights, the turnpike company had a specific remedy under the act of assembly. The court held: "The fact that the act of assembly incorporating a turnpike company gives it a specific remedy for an injury to its rights does not impair the separate right of the Commonwealth to indict."

In Stehle v. Jaeger Auto. Co., 220 Pa. 617, it was held that the fact that an act of assembly made it an offence to employ a child of tender years was not an exclusive remedy and did not supersede the right of action for damages in a civil proceeding.

We think the case of Com. v. Wilkins, 271 Pa. 523, disposes of this contention. In that case the Commonwealth, at the relation of the Attorney-General, filed in this court a petition for a writ of peremptory mandamus against school directors to require them to dismiss certain children alleged to have been admitted to the public schools in violation of an act of assembly. The act provided a statutory penalty for failure to perform the duty which the petition alleged the directors had violated. Judge Henry, specially presiding, concluded that the remedy by mandamus was not available because there was a remedy provided for the enforcement of the act which he held to be exclusive. The syllabus is as follows: "An indictment is merely punitive and not remedial; hence, it cannot take the place or usurp the functions of a mandamus, which seeks specific relief by commanding the performance of a public duty."

In this case Mr. Justice Simpson discussed the precise question at length. He said, page 528:

"It might just as well be said that because an act simply provided that embezzlement of public funds should be punished by fine and imprisonment, there could be no recovery by a civil action against the embezzler. It is rare, indeed, that a statute expresses the fact that existing remedies for its enforcement are reserved, nor is it requisite it should do so; yet this is the necessary conclusion from the opinion below, which says, in effect, that because no such reservation is expressed, the legislature must have intended that, by simply paying a fine, public officials, charged with the duty of preventing the spread of contagious diseases, can obtain a right to neglect their duty and subject the people to the risk of contagion, against which the statute was intended to secure them. This is, of course, unsupposable; when the Commonwealth declares her public policy on such important State matters, instead of it being necessary to reserve the right to proceed, the courts will always presume—in the absence of an express provision otherwise—that she retains the right to pursue every existing means necessary to compel her officials to enforce that policy. . . .

"Can a public officer be compelled to perform the duties of his office, even though he may be punishable by fine or imprisonment, or both, if he does not? Upon this point there should not be any doubt; nor is there in this State."

The principles are the same whether invoked in cases of quo warranto or mandamus. If mandamus will lie against a public officer, notwithstanding he is punishable by fine or imprisonment, quo warranto would lie against a corporation which has violated its corporate privileges and powers, notwithstanding it might be punishable by fine.

Moreover, the instant case especially demonstrates that the interests of the Commonwealth cannot be preserved by resort only to the penalty of four dollars provided for violation of the Act of 1794. The Legislature of 1925 passed "An act making an appropriation to a commission to be appointed by the Governor, to be used and expended for and toward the celebration of the Sesqui-Centennial Anniversary of the Independence of the United States at Philadelphia" (Appropriation Acts, 1925, page 160). The appropriation was $750,000. Section 5 of the act provided that "the Sesqui-Centennial shall be conducted in strict conformity with existing Sunday observance." It is certain that when an appropriation of public funds of such a size is made upon

such a declaration, not to say condition, and when there is an alleged violation of law, the public interests of the State are sufficiently involved to arouse the interest of, and investigation by, the Attorney-General.

We are, therefore, of opinion that when a corporation engages in a course of conduct which is an abuse of its charter powers, it is answerable in *quo warranto*, even though the abuse amounts to an offence for which there is some other punishment. It makes no difference whether the offence is indictable as a crime or punishable summarily. If it is unlawful to do the act and the corporation persists in that unlawful conduct, it abuses its charter privileges, because every charter is granted under the implied duty that the corporation will be so conducted as to observe the laws of the land.

The Act of 1794 is a penal statute. *Quo warranto* is a civil remedy. The purposes of the two remedies are entirely different; one is to punish the offence, the other to protect the sovereign State and the public so that corporations shall exercise only those powers and privileges granted to them.

The cases cited by the respondent do not affect this principle. In Com. *v.* Allegheny Bridge Co., 20 Pa. 185, 189, a writ of *quo warranto* was issued at the suggestion of a private individual against the company, alleging that it was violating its charter privileges, and it was held that if the corporation did the relator a legal injury, he was not entitled to this remedy, but to the appropriate action in his own name for damages done.

The court said: "For the remedy by *quo warranto* is not allowed where the law affords a private remedy. . . . But there is another answer to the whole complaint. That is, that we do not hear a private relator in this court claiming to forfeit a charter, and he has no right to such action in any court where he stands as a mere informer without interest."

We are referred to the case of Phila., Wilmington & Balt. R. R. Co. *v.* Phila. & Havre de Grace Steam Towboat Co., 64 U. S. 209, which was an appeal from a libel filed by one corporation against another for a marine tort consisting of operating a steamboat on Sunday. The court said, page 218: "The law relating to the observance of Sunday defines the duty of a citizen to the State, and to the State only. For a breach of this duty he is liable to a fine or penalty imposed by the statute, and nothing more. Courts of justice have no power to add to this penalty the loss of a ship, by the tortious conduct of another, against whom the owner has committed no offence."

But no principle of the right of a state to regulate the conduct of one of its corporations is involved in that case. The nearest approach to an authoritative declaration sustaining the position of the respondent is the opinion of Attorney-General Carson in Taxpayers' League's Petition, 16 Dist. R. 1003. A petition was presented to the Attorney-General for permission to use his name in issuing a writ of *quo warranto* against the Union Traction Company of Reading, for the purpose of forfeiting "all and singular its charter franchises and privileges," and contending that said company "has no longer power to exercise any corporate right or privilege whatsoever." The Attorney-General said: "To deprive the citizens of Reading of the services of a public utility corporation and strike the corporation out of existence, and thereby compel a large population to walk, because a few councilmen ride free, would be the application of a remedy so drastic as to involve a public inconvenience and mischief far exceeding the wrong sought to be redressed."

It must be borne in mind that Attorney-General Carson had the right to use his discretion to determine whether he should allow the use of the name of the Commonwealth in proceedings in *quo warranto*. The language already quoted from his opinion shows abundant authority for refusing the request.

Com. ex rel. Attorney-General v. Sesqui-Centennial Exhibition Association.

The two cases are entirely different. In one the Attorney-General was asked to destroy a public utilities corporation. In the instant case the Attorney-General only asked that the corporation be ousted from exercising powers it does not have. However, with reference to the fact that the act of assembly, which prohibits the giving of free passes, provided a penalty, the Attorney-General said: "It is a legislative declaration of the method to be pursued in the enforcement of the Constitution. It is not open to citizens to question the wisdom of legislative remedies by ignoring them or to substitute other remedies. So long as the legislature has seen fit to prescribe that method in pursuance of an express constitutional obligation to enforce the article, it amounts to a declaration on the part of the representative of the people that the method chosen is the appropriate method to be pursued. There is no warrant or authority for a resort to *quo warranto* proceedings, and it is a fallacy to argue that the issuing of passes is the exercise by the corporation of a power, privilege or franchise not granted or appertaining to such corporation."

We do not understand this language to go to the extent claimed for it by the respondent here. The issuing of passes was the exercise of the power incident to the corporation. If it occasionally issued passes to the Reading councilmen, and thereby violated the law, the Attorney-General held that the violation was not so serious as to warrant the taking away of the charter of the corporation, because there was another punishment provided. There was no case presented to him which, in his opinion, justified his proceeding in *quo warranto* to forfeit the charter. The situation is different here. The Attorney-General in the instant case has found that the situation justifies him in appearing as relator in a suit by the Commonwealth to question the corporate conduct of the respondent.

The cases deciding that there is no jurisdiction in equity to enjoin the violation of the Act of 1794 do not afford us any help: Sparhawk v. Union Passenger Ry. Co., 54 Pa. 401; Kenton v. Union Passenger Ry. Co., 54 Pa. 401, 452; Com. v. Smith, 266 Pa. 511. These cases simply decide that equity has no jurisdiction to restrain a violation of the Sunday law of April 22, 1794, inasmuch as the act provides a penalty for its violation, and there is, therefore, an adequate remedy at law.

There is no adequate remedy at law to protect the rights of the Commonwealth, and, therefore, the principle that, because the Act of 1794 provides its own penalty, it ousts the jurisdiction of the Attorney-General in a proceeding in *quo warranto*, cannot be sound. We think that Chief Justice Woodward, in Kenton v. Union Passenger Ry. Co., 54 Pa. 401, 452, 454, stated the law when he said: "I think the company's violation of the Sunday law can be redressed only by enforcing the statutory penalty, or by a proceeding on behalf of the Commonwealth against the company for misuse or abuse of their charter, and not by a proceeding in equity where the parties complaining have no other interest than that which is common to the whole community."

For these reasons we are of opinion that there is jurisdiction to test by *quo warranto* the right of the respondent to exercise the powers it claims and which are in dispute.

We must now consider whether the respondent has violated and continues to violate the Act of 1794. This is a pure question of the construction of that act as applied to the conduct of the respondent.

The Director General of the respondent was called as a witness as if on cross-examination. This was objected to, but the court permitted it. That this was not error is settled by the case of Manor National Bank v. Lowery,

242 Pa. 559, 565, in which the Supreme Court, referring to the Act of March 30, 1911, P. L. 35, said: "The purpose of the act is to make the representative of a corporation, transacting its affairs, subject to cross-examination like an individual litigant under similar circumstances."

In any event, the testimony was brought out by the respondent itself, and, even if error, it could have done the respondent no harm. We might, in our discretion, have permitted leading questions where an officer of a corporation was called by the opposite party: Gantt *v.* Cox & Sons Co., 199 Pa. 208, 217. But the large portion of the testimony in this case was not elicited by leading questions.

Strong as the temptation may be, and to which we find many of the judges who have discussed the Act of 1794 have succumbed, we shall not indulge in any panegyric upon this act, and its social, economic and religious value, nor discuss the distinctions between the Jewish Sabbath and the Christian Sunday, except to say that "this is a Christian Nation" (Holy Trinity Church *v.* United States, 143 U. S. 457, 471), and that "the Christian religion, and the sanctity of Sunday as a holy day, is an inseparable part of our fundamental law:" Com. *v.* Coleman, 60 Pa. Superior Ct. 380, 385; Updegraph *v.* Com., 11 S. & R. 394, 400; Vidal *v.* Girard's Executors, 2 Howard, 127, 198. Of this Act of 1794, venerated as it is by age, Judge Woodward, in Johnston *v.* Com., 22 Pa. 102, 110, said: "Our duty requires us to construe the statute so as to accomplish its purpose, which was to enforce an observance of Sunday instead of obliterating it."

The title of the Act of April 22, 1794, 3 Sm. Laws, 177, is: "An act for the prevention of vice and immorality, and of unlawful gaming, and to restrain disorderly sports and dissipation."

The first section provides, in part: "If any person shall do or perform any worldly employment or business whatsoever on the Lord's Day, commonly called Sunday, works of necessity and charity only excepted, or shall use or practice any unlawful game, hunting, shooting, sport or diversion whatsoever on the same day, and be convicted thereof, every such person, so offending, shall, for every such offence, forfeit and pay four dollars, to be levied by distress. . . ."

As applied to the instant case, several questions confront us in the construction of this act: 1. Is the operation of the Sesqui-Centennial Exposition on Sunday worldly employment or business? 2. If so, does it fall within the exception as a work of necessity or charity? 3. Are the "diversions" permitted there within the prohibition of the act?

1. Is this a worldly employment or business? The Act of June 14, 1887, P. L. 383, under which the exhibition association was incorporated, provides for the incorporation of companies "for the encouragement of the arts and sciences and of agriculture and horticulture." The respondent was incorporated for the purpose of "exhibiting artistic, mechanical, agricultural and horticultural products and providing public instruction in the arts and sciences, thereby celebrating the one hundred fiftieth anniversary of the signing of the Declaration of Independence by holding . . . an exhibition," etc. "Worldly" is defined in the Standard Dictionary as "pertaining to the world, devoted to temporal and neglectful of eternal things—not spiritual—secular or lay as opposed to churchly or monastic." There is no suggestion in the act nor in the purposes of this corporation that anything spiritual is to be done under its charter. The mere fact that religious services are held on Sunday within the exposition grounds as an incident to the opening of the Exposition on that day, does not tend to make the opening a religious or

Com. ex rel. Attorney-General v. Sesqui-Centennial Exhibition Association.

spiritual business or employment. A religious service held in one place is a very small part of the activities spread over a thousand acres. In Com. v. Nesbit, 34 Pa. 398, 409, the court said: "Very evidently, 'worldly' is contrasted with religious, and the worldly employments are prohibited for the sake of the religious ones."

In Com. v. Weidner, 4 Pa. C. C. Reps. 437, it is held that "the collection of a compulsory admission fee at the entrance gate to camp-meeting ground on Sunday is a worldly employment or business prohibited by the Act of April 22, 1794." The court said: "When the wayward sinner is forbidden entrance to the church unless he hands over his nickel to the doorkeeper, the church so demanding and receiving on Sunday is in no better position, so far as 'worldly business is concerned,' than would be the circus man with his one price of admission to all the several and combined shows of his monster aggregation, or the peddler with his busy booth."

The respondent contends, upon the authority of Com. v. Nesbit, 34 Pa. 398, that the violation of the Act of 1794 must be tested by the ordinary business or calling upon which the one charged is engaged and not by an isolated act. We think neither the case cited, nor reason, sustains that conclusion. If a minister of the gospel gambled on Sunday he would violate the act. But, even adopting that construction, conducting an exposition is the ordinary business of this respondent, and it certainly is a "worldly employment or business." Therefore, if it engages in its ordinary business on Sunday it violates the act unless it comes within the exception. We think further discussion is unnecessary to demonstrate that the conduct of this Exposition is a worldly business.

2. Is it a work of necessity or charity? The exception in the act is "necessity and charity;" that is, works of charity are exempted when they are also necessary, but we shall adopt the more liberal interpretation, construing the "and" to mean "or," and consider whether the Exposition can be legally put in either class. We cannot adopt the contention that it must be considered a charity because it is a corporation "not for profit," and its aims and purposes are altogether altruistic. It is argued that the Exposition is a great educational institution. We agree. So is the University of Pennsylvania, but it is not a charity, and works of education are not within the exception of the act. We also agree, as contended by the respondent, that the word "charity" as used in this act is to be given a broader interpretation than almsgiving. The usual and necessary work connected with religious worship or reasonably incident thereto is work of charity: Dale v. Knepp, 98 Pa. 389; 2 Words and Phrases, 1087.

In Bucher v. Fitchburg Railroad Co., 131 Mass. 156, 159, the court said: "In order to constitute an act of charity, such as is exempted from the Lord's Day Act, the act which is done must be itself a charitable act. The act of ascertaining whether a charity is needful is not the charity."

In Doyle v. Lynn & Boston R. R. Co., 118 Mass. 195, 197, the court said: "In considering what is lawful or fit to be done on the Lord's Day, 'charity' must include everything which proceeds from a sense of moral duty, or a feeling of kindness and humanity, and is intended wholly for the purpose of the relief or comfort of another, and not for one's own benefit or pleasure:" 37 Cyc., 556.

In Knight's Estate, 159 Pa. 500, 502, it is said: "Charity is understood to refer to something done or given for the benefit of our fellows or of the public," but that means given without compensation, and when one pays for what he gets, it can hardly come under the broad mantle of charity.

In Episcopal Academy v. Philadelphia, 150 Pa. 565, it is said: "Whatever is done or given gratuitously in relief of the public burdens or for the advancement of the public good is a public charity. Where the public is the beneficiary, the charity is public, and where no private or pecuniary return is reserved to the giver or to any particular person, but all the benefit resulting from the gift or act goes to the public, it is a purely public charity."

Applying these definitions, the holding of this Exposition, with a charge for admittance, could not be a charity however commendable and highly educational it may be. It is not a charitable act to require an admission fee to enter the Exposition, even though it might be argued that it is charitable to let those who enter play around on the recreations without an extra fee, but that is not "for the purpose of the relief," and certainly is only for the recreational benefit or pleasure of those who choose to go on Sundays. Stripping all pretence from the case, such an arrangement must be for the purpose of inducing a larger crowd to go on that day.

The cases relating to trusts defining "charity" and "charitable" do not help us. They refer to gifts "for the purpose of an indefinite number of persons, and designed to benefit them from an educational, religious, moral, physical or social standpoint:" Taylor v. Hoag, 273 Pa. 194, 196. In charitable gifts there is no contemplation of return to the giver. There is no question of a gift in this case unless it be the gift to which we have just referred, of using the diversions without charge on Sunday, or the gift of the unstinted patriotic service of the directors who manage the activities of this Exposition, but the individual motives of the directors cannot be reflected in the Exposition itself. Therefore, patriotic as the design and purpose of the Exposition is, we cannot extend the meaning of the word "charity" as used in the Act of 1794 to cover the holding of this Exposition.

We have no difficulty in determining that it is not a work of necessity. In Sparhawk v. Union Passenger Ry. Co., 54 Pa. 401, 409, the court, discussing the Act of 1794, said: "When the thing to be determined is whether worldly business done by any man, and not described in the proviso, is exempt from the prohibition because a work of necessity, the question must always be—is it necessary to him who does it? The defendants do not claim that the running of their cars for hire on Sunday is a charity, nor even that it is necessary for them. All they assert is that it is a convenience or a necessity for others. I think the act does not allow them to shelter themselves under others."

So, in Johnston v. Com., 22 Pa. 102, 109, it is said: "If we decide that necessity and charity mean convenience, . . . we emasculate the statute, and sweep away the guards that the legislature threw around not only the morals of society, but the physical health and well-being of both men and beasts. If Sunday be thus surrendered to the fierce rivalry of efforts for promoting the convenience of the people, it might as well be blotted from the calendar of days. But we have no right to give up this institution."

It follows that, commendable as the whole scheme of holding this Exposition is, it is not a work of necessity so as to justify its operation on Sunday. We might add, in passing, that the cases just cited dispose of the contention that it is financially important to keep the Exposition open on Sunday. This is an argument of convenience, and we cannot subordinate the plain mandate of the law to the financial needs of the respondent.

Sales of souvenirs on Sunday have been permitted because of their educational value. However educational these souvenirs may be, because of the replicas upon them, it is not necessary that they should be sold on Sunday, and certainly the selling of them is not "a work of charity." Notwithstand-

Com. ex rel. Attorney-General *v.* Sesqui-Centennial Exhibition Association.

ing the orders of the officials in charge, other things than official souvenirs have been sold, which demonstrates that, because of the magnitude of the enterprise, it would be impossible to operate the institution so that exhibitors with sale privileges would not yield to the temptation of selling their goods. But we place our decision squarely upon the proposition that the opening of this Exposition on Sundays is a "worldly employment or business" and not "a work of necessity or charity."

3. What we have said disposes of the case, but we may add that the amusements and recreations within the Exposition grounds are clearly in violation of the Act of 1794. They are beyond any doubt worldly and cannot, upon any stretch of imagination, be considered either works of necessity or charity: Com. *v.* Coleman, 60 Pa. Superior Ct. 380; Com. *v.* Rapp, 23 Dist. R. 145. Moreover, the respondent is in the position of paying the concessionaires to operate these diversions and amusements on Sundays and to that extent encouraging the violation of this act.

It follows that the petition of the Attorney-General must be sustained, and that the respondent must be ousted from the exercise of any pretended right to conduct and operate the Sesqui-Centennial Exposition on Sundays.

What we have said in coming to our conclusion must not be understood as containing any reflection upon the motives or good faith of the directors and officers of the Sesqui-Centennial Exhibition Association in determining to open the Exposition on Sundays. This Exposition was inspired and developed by the highest ideals of those who have given devoted, unselfish and untiring service to it, but, patriotic as their motives are, it is our duty to declare that they have transcended their lawful powers by the Sunday opening.

Now, Sept. 16, 1926, it is hereby adjudged, ordered and decreed that the Sesqui-Centennial Exhibition Association be ousted from any right, privilege or authority to open, hold or conduct the Exposition operated by the said respondent association on the Lord's Day, commonly called Sunday, and that the respondent pay the cost of this proceeding, unless exceptions be filed within the time limited by law. From Homer L. Kreider, Harrisburg, Pa.